UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>JEAN PAUL VAN AVERMAET,<br><br>Defendant. | Criminal No. 21-cr-443-4 (TSC/ZMF) |

**MEMORANDUM OPINION**

The government charged Jean Paul Van Avermaet and three co-defendants with conspiracy to rig bids and fix prices for contracts involving security services.  Indictment ¶ 16, ECF No. 1.  The United States solicited bids and entered into contracts with Defendants for security services on United States military bases in Belgium.  *Id.* ¶ 19.  The single-count Indictment charges Van Avermaet with violating the Sherman Act between 2019 and 2020 by conspiring to fix prices for contracts with the United States through the Department of Defense ("DoD") and with the North Atlantic Treaty Organization ("NATO"), a multilateral military alliance funded in part by the United States.  *Id.* ¶ 16; 15 U.S.C. § 1.  The objective of the conspiracy was to win and receive payments for DoD and NATO security contracts at non-competitive, inflated prices.  Indictment ¶ 17.

According to the Indictment, Van Avermaet is a resident and citizen of Belgium, and from 2010 to 2020 served as CEO of G4S Secure Solutions, a Belgian company also alleged to have played a role in the conspiracy.  Indictment ¶¶ 6–7.  Van Avermaet is alleged to have arranged a "coordination breakfast meeting" between the heads of two of G4S's competitors and co-conspirators in September 2019.  *Id.* ¶¶ 4, 11, 18(a).  The government more broadly alleges

his participation in the conspiracy through his role as CEO of G4S.  Gov't's Consol. Opp'n to Mots. to Dismiss at 7, ECF No. 48.

Van Avermaet moved to dismiss for lack of jurisdiction the portion of the single-count Indictment related to the NATO contracts and the portion of the Indictment related to the DoD contracts for failure to state an offense.  Mot. to Dismiss NATO Portion of Count One, ECF No. 42 ("NATO MTD"); Mot. to Dismiss DoD Portion of Count One, ECF No. 43 ("DoD MTD").  If granted, the motions would dispose of the entire Indictment.  The court referred the matter to Magistrate Judge Zia M. Faruqui for full case management up to and including issuance of a Report and Recommendation on any dispositive motions.  January 26, 2023 Minute Order.  Magistrate Judge Faruqui entered a Report and Recommendation ("R&R") on June 2, 2023, recommending that the court DENY both motions.  R&R, ECF No. 56.  Defendant objected to the R&R, the government responded to the objections, and Defendant submitted a reply.  Objs. to R&R, ECF No. 57 ("Objections"); Gov't's Opp'n to Objs. to R&R, ECF No. 60 ("Opp'n to Objections"); Reply ISO Objs. to R&R, ECF No. 61 ("Reply ISO Objections").

The court, while modifying the reasoning, accepts Magistrate Judge Faruqui's ultimate recommendation with respect to the NATO motion to dismiss, and adopts the R&R with respect to the DoD motion to dismiss.  Consequently, for the reasons set forth below, the court will DENY Van Avermaet's NATO and DoD motions to dismiss.

### I.  LEGAL STANDARD

The Federal Magistrates Act lists eight pretrial motions, including motions to dismiss or quash an indictment, for which Magistrate Judges may provide "proposed findings of fact and recommendations for the disposition [of the matter]."  28 U.S.C. § 636(b)(1)(B); *see Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 945 (D.C. Cir. 2017).  Recommendations are reviewed de novo by a district court judge.  28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P.

59(b). The district court judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions. Fed. R. Crim. P. 59(b)(3).

Title 18, section 3231 of the United States Code gives U.S. district courts original jurisdiction over "all offenses against the laws of the United States." 18 U.S.C. § 3231. "[I]f an indictment or information alleges the violation of a crime set out in Title 18 or in one of the other statutes defining federal crimes, that is the end of the jurisdictional inquiry." *United States v. Fahnbulleh*, 752 F.3d 470, 476 (D.C. Cir. 2014). If the Indictment states a violation of the Sherman Act, 15 U.S.C. § 1, "[n]o more is necessary to establish subject matter jurisdiction." *Id.* "A motion that the court lacks jurisdiction may be made at any time while the case is pending." Fed. R. Crim. P. 12(b)(2).

The Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA") "excludes from the Sherman Act's reach much anticompetitive conduct that causes only foreign injury." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 158 (2004). "It does so by setting forth a general rule stating that the Sherman Act 'shall not apply to conduct involving trade or commerce . . . with foreign nations.'" *Id.* (quoting 15 U.S.C. § 6a). The FTAIA creates exceptions to the general rule where the charged "conduct has a direct, substantial, and reasonably foreseeable effect" on U.S. domestic commerce. 15 U.S.C. § 6a(1)(A). In this Circuit, the FTAIA applies as a jurisdictional limit on the Sherman Act's reach. *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338, 341 (D.C. Cir. 2003) (*Empagran I*), *vacated sub nom. F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) (*Empagran II*) ("[W]e believe that our holding regarding the jurisdictional reach of FTAIA is faithful to the language of the statute."); *see also Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1269 (D.C.

Cir. 2005) (*Empagran III*) (concluding that "we are without subject matter jurisdiction under the FTAIA.").

A criminal defendant may also move to dismiss based on a "defect in the indictment," such as a "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). "In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes." *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (citing *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006)); *see also United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001) ("Adherence to the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury."). On a motion to dismiss, the court assumes the truth of the indictment's allegations. *See, e.g.*, *United States v. Weeks*, 636 F. Supp. 3d 117, 120 (D.D.C. 2022); *see also Sunia*, 643 F. Supp. 2d at 60. This is because "[a] defendant has no right to judicial review of a grand jury's determination of probable cause to think a defendant committed a crime." *Kaley v. United States*, 571 U.S. 320, 333 (2014). "Because a court's use of its supervisory power to dismiss an indictment directly encroaches upon the fundamental role of the grand jury, dismissal is granted only in unusual circumstances." *United States v. Fischer*, 64 F.4th 329, 334–35 (D.C. Cir. 2023) (formatting modified).

## II.     ANALYSIS

### A.     <u>Areas of Agreement and Objections No Longer at Issue</u>

The R&R concluded that that "Mr. Van Avermaet's anticompetitive conduct concerning the NATO contracts" created a direct and substantial effect on domestic commerce. R&R at 8; *see also id.* (finding "sufficient domestic harm from anticompetitive conduct in NATO's contracting process because the U.S. government was the most significant funder of NATO and

the main force behind NATO," even though the United States "was not a direct party to the contract"). Van Avermaet objects to the R&R's conclusion that the United States' contributions to NATO's common fund confer jurisdiction, citing a Justice Department policy determination that "U.S. government interests would not be considered to be sufficiently implicated with respect to a transaction that is merely funded by an international agency" like NATO. Objections at 5–6; *see also* U.S. Dep't of Just. & Fed. Trade Comm'n, *Antitrust Guidelines for International Enforcement and Cooperation* 27 (2017) ("DOJ Guidelines").

The government did not address this objection, contending that the court "need not reach Judge Faruqui's alternate holding . . . that the harm to U.S. commerce through the NATO contracts independently satisfies the effects exception." Opp'n to Objections at 4. Van Avermaet argues that the government conceded that a conspiracy directed solely at a NATO contract would be excluded from this court's jurisdiction under the FTAIA. Reply ISO Objection at 2–3. But that is not the conspiracy alleged here. Because the court concludes that the Indictment alleged a conspiracy to rig bids for both NATO and DoD contracts—and therefore involved conduct with a direct, substantial, and reasonably foreseeable effect on domestic commerce—it need not decide this objection.

Importantly, Van Avermaet did not dispute, either in his motions to dismiss or his Objections, the Indictment's charge that anticompetitive conduct concerning the DoD contracts had a direct, substantial, and reasonably foreseeable effect on domestic commerce and therefore satisfied the FTAIA's domestic effects exception, at least with respect to the conspiracy as it targeted DoD contracts. Indictment ¶ 19; *see* Objections at 11–12 (failing to raise a jurisdictional defect with respect to conduct aimed at fixing bids on a DoD contract); Reply ISO Objections at 3 (acknowledging that the R&R found that conduct aimed at a DoD contract brought

Defendants' conduct into the Sherman Act's ambit and arguing only that this finding did not permit the court to also consider conduct aimed at a NATO contract); Opp'n to Objections at 4. Consequently, the court understands the parties to agree that the bid-rigging conduct behind the alleged conspiracy had a domestic effect through any contracts with the DoD. *See* R&R at 7 (finding the "DoD suffered injury by paying inflated, non-competitive prices for security service contracts" and the "U.S. government—the ultimate domestic consumer—overpaid for security services because of the conspiracy to mitigate competition").

**B.      Objection 1:  The R&R erroneously concludes that the court has jurisdiction over the entire conspiracy based on the domestic effects of the DoD contract.[1]**

The parties dispute whether the alleged bid-rigging conduct as it relates to DoD contracts brings the entire conspiracy within the ambit of a criminal prosecution under the Sherman Act. *See* R&R at 6. The court finds that it does.

---

[1] This subheading is drawn from the Objections but does not endorse Defendant's framing of the Indictment. Van Avermaet's motions conflate the offense charged in the indictment with a single DoD contract and a single NATO contract. *Compare* NATO MTD at 2 n.1 ("The indictment asserts that this Court has jurisdiction over Mr. Van Avermaet because of only two specific contracts, one with the North Atlantic Treaty Organization (NATO) and the other with the Department of Defense (DoD)."), *with* Indictment ¶ 17 ("The charged combination and conspiracy consisted of a continuing agreement . . . [to] allocate customers, rig bids, and fix prices for *contracts* for the provision of security services in Belgium, including *contracts* with the United States and the NCI Agency [NATO] . . . ."), *and* ¶ 19 ("The United States solicited bids from and entered into *contracts* with the Defendants for security services provided to United States military bases in Belgium.") (emphasis added). The court rejects this reframing. "The grand jury gets to say—without review, oversight, or second guessing—whether probable cause exists to think that a person committed a crime." *Kaley*, 571 U.S. at 328. "Here, the grand jury explicitly found probable cause to believe that Van Avermaet participated in a conspiracy whose object included rigging both DoD and NATO *contracts*," not a single DoD contract or a single NATO contract. *See* Gov't's Consol. Opp'n to Mots. to Dismiss at 8 (emphasis added).

      i.       The Scope of Conduct Considered under the FTAIA

The FTAIA refers to "conduct" excluded from the Sherman Act: "Sections 1 to 7 of this title shall not apply to *conduct* involving trade or commerce . . . with foreign nations unless such *conduct* has a direct, substantial, and reasonably foreseeable effect" on domestic commerce, and "such effect gives rise to a claim under the provisions" of the Act. 15 U.S.C. § 6a (emphasis added). The parties disagree over the meaning of "conduct" and specifically over the level of generality at which the court should analyze the acts charged in the Indictment. The government argues that the "conduct at issue under the FTAIA is the single, overarching conspiracy alleged in the Indictment . . . ." Opp'n to Objections at 1. Van Avermaet acknowledges the statutory text, Objections at 3, but argues that the FTAIA "requires a district court to separately analyze each type of commerce to determine whether it falls within an exception to FTAIA's jurisdictional bar," *id.* at 11. *See also* Reply ISO Objections at 6 ("Even the government's own policy on international antitrust enforcement analyzes transactions, not the entire conspiracy."); Reply ISO NATO MTD at 2, ECF No. 49 ("Courts and DOJ policy require an examination of whether the commerce placed at issue in the indictment falls within the scope of the Sherman Act and is not precluded by the FTAIA.").

The court agrees with the government that the "broader" definition of conduct applies. *Empagran I*, 315 F.3d at 344, *vacated on other grounds sub nom. Empagran II*, 542 U.S. 155 (2004). In *Empagran I*, the D.C. Circuit squarely considered the question presented here: "As an initial matter, the parties appear to dispute the scope of the 'conduct' that should be considered for our FTAIA analysis." *Id.* As here, one party argued that the relevant conduct was the "massive international cartel, exercising global market power," *i.e.*, the entire conspiracy. *Id.* (internal citations omitted). The other argued that the relevant conduct was "solely the market transactions between them and the foreign plaintiffs overseas." *Id.* The D.C. Circuit held that the

first approach was correct, noting that the Second and Fifth Circuits had similarly "rejected a narrow definition of 'conduct' as '[t]he precise acts that caused injury,' and instead adopted a broader definition of 'conduct' as 'acts that are illegal under the Sherman Act,' that is, the international price-fixing conspiracy." *Id.* (quoting *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 398 (2d Cir. 2002), *abrogated on other grounds by Empagran II*, 542 U.S. 155 (2004)); *see also Kruman*, 284 F.3d at 399 ("In sum, the 'conduct' in this case was not the imposition of high prices pursuant to an illicit agreement, but the alleged agreement by the defendants to fix prices in foreign auction markets.").

Although neither party here cited the D.C. Circuit's ruling in *Empagran I* despite six filings regarding the NATO motion to dismiss, *Empagran I's* definition—which the Supreme Court did not address in *Empagran II*[2]—governs this court's interpretation of the scope of "conduct" considered under the FTAIA. It remains good law and binding on this court. *See Boehner v. McDermott*, 332 F. Supp. 2d 149, 156 (D.D.C. 2004) (quoting *Kurtz v. Baker*, 644 F. Supp. 613, 621 (D.D.C. 1986) ("Although a decision vacating a judgment necessarily prevents the opinion of the lower court from being the law of the case, the expressions of the court below on the merits, if not reversed, will continue to have precedential weight and, until contrary authority is decided, are likely to be viewed as persuasive authority if not the governing law of the . . . Circuit.") (subsequent history omitted). Van Avermaet provides no case support for his contention that this definition of "conduct" should not apply. And because he has acknowledged

---

[2] The Supreme Court's opinion in *Empagran II* supports the broader reading of "conduct." *See Empagran II,* 542 U.S. at 158 (noting the Court "focus[ed] upon anticompetitive price-fixing activity that is in significant part foreign, that causes some domestic antitrust injury, and that independently causes separate foreign injury" and answered the question whether "the price-fixing activity" constituted "conduct involving trade or commerce . . . with foreign nations" in the affirmative).

that at least some of the charged conduct—that is, the anticompetitive conduct directed at the DoD contracts—had a direct, substantial, and reasonably foreseeable effect on domestic commerce, that is the beginning and end of the inquiry. *See Empagran I*, 315 F.3d at 344 ("[I]t is unnecessary for us to explore further the precise parameters of the definition of 'conduct,' since there is no real dispute that the vitamin companies' conduct had 'a direct, substantial, and reasonably foreseeable effect' on U.S. commerce."). The R&R did not err in concluding that the alleged bid-rigging "conduct as it relates to DoD contracts—i.e., foreign contracts with the American government—brings the entire conspiracy within the ambit of the Sherman Act." R&R at 6.[3]

   ii. <u>The Scope of the FTAIA in the Criminal Context</u>

  Van Avermaet argues that courts "regularly" allow a contract-by-contract analysis by "dismissing the parts of a single antitrust conspiracy that concern foreign commerce claims barred by the FTAIA and allowing the remaining parts of the lawsuit to proceed." R&R at 6 (quoting Reply ISO NATO MTD at 6). He cites several civil cases in support of that proposition, and objects to the R&R's conclusion that those civil suits are distinguishable. Objections at 10–11; *see also* R&R at 6–7 (noting that Van Avermaet's "supporting cases involve the dismissal of discrete *claims* in civil antitrust cases, rather than the dismissal of discrete *portions* of a single conspiracy charge in a criminal antitrust case"). Van Avermaet's objection is without merit.

---

[3] The court declines to give the Ninth Circuit's decision in *United States v. Hsiung*, 778 F.3d 738 (9th Cir. 2015), the weight accorded by the R&R. *See* R&R at 6. That decision first found that the FTAIA "is not a subject-matter jurisdiction limitation on the power of the federal courts but a component of the merits of a Sherman Act claim," *id.* at 751, and is therefore of limited use in determining the jurisdictional scope of the FTAIA.

The Supreme Court has distinguished between private suits and suits brought by the government in the context of government-initiated proceedings for equitable relief. In *Empagran II* it explained that a government plaintiff, "unlike a private plaintiff, must seek to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm." *Empagran II*, 542 U.S. at 170 (citing the Attorney General's and United States attorneys' statutory obligations under 15 U.S.C. § 25); *see also* 2 P. Areeda, Hovenkamp & R. Blair, *Antitrust Law* ¶¶ 303d–303e, pp. 40–45 (2d ed. 2000) (distinguishing between private and government suits in terms of availability, public interest motives, and remedial scope). In rejecting the Sherman Act's application to foreign conduct that causes independent foreign harm that alone gives rise to a plaintiff's claim, the Court found that the government's ability "to obtain relief helpful to those injured abroad tells us little or nothing about whether this Court would have awarded similar relief at the request of private plaintiffs." *Empagran II*, 542 U.S. at 171. Applying the same reasoning, courts' application of *Empagran II* in the civil context does not determine the government's latitude to bring a criminal indictment over price-fixing conduct that affects both domestic and international consumers.

The government points to *Motorola Mobility LLC v. AU Optronics Corporation*, 775 F.3d 816 (7th Cir. 2014), to argue that the R&R correctly recognized that the FTAIA applies differently to government enforcement actions than to private damages actions. Opp'n to Objections at 6, 8. In that case, the Seventh Circuit rejected private plaintiff Motorola's claim for damages based on certain categories of LCD panels that were not imported directly into the United States, separately considering subgroups of price-fixed panels in the same way Van Avermaet urges the court to consider separate price-fixed contracts. *Motorola*, 775 F.3d at 817– 20. The United States, as amicus curiae, had asked the Seventh Circuit to "hold that the

conspiracy to fix the price of LCD panels had a direct, substantial, and reasonably foreseeable effect on U.S. import and domestic commerce in cellphones incorporating these panels." *Id.* at 825; *see also* Br. for the United States and the Fed. Trade Comm'n as Amici Curiae in Supp. of Neither Party at 14, *Motorola*, 775 F.3d 816 (7th Cir. 2014), 2014 WL 4447001, at *14 ("[T]his Court should hold that defendants' conspiracy had a direct effect on import and domestic commerce in cellphones."). The Seventh Circuit assumed without deciding that the cartel's price fixing of those panels directly, substantially, and foreseeably affected U.S. commerce by increasing the price of cellphones incorporating those panels that were sold in the United States, but it held that any such effect did not give rise to Motorola's foreign subsidiaries' claims. *Motorola*, 775 F.3d at 819–20.

The United States also argued in that case that the criminal and injunctive provisions of the Sherman Act applied to all defendants' price fixing conduct. *Id.* at 825. The Seventh Circuit agreed, holding that if "price fixing by the component manufacturers had the requisite statutory effect on cellphone prices in the United States, the Act would not block the Department of Justice from seeking criminal or injunctive remedies." *Id.*; *see also id.* at 827 (favorably citing an article that made "a number of pertinent observations, particularly concerning the differences between a private damages suit and a government suit seeking criminal or injunctive remedies" and noted the court could "find jurisdiction under the FTAIA for DOJ prosecutions while addressing the concerns raised by China, Japan, Korea, and Taiwan about an unduly expansive application of U.S. law [that] they claim would undermine principles of international comity" if Motorola's private damages claims were allowed to continue). Van Avermaet contends that the Seventh Circuit did not hold that the FTAIA should be applied differently in civil and criminal matters and that the government's amicus brief "acknowledg[ed] that the same interpretation of

the FTAIA governs both civil and criminal actions." Reply ISO Objections at 8. That reading misconstrues the United States' position and elides Judge Posner's holdings regarding the FTAIA. The United States clearly argued that government enforcement actions should be treated distinctly from the private claims at issue: "Unlike civil damage claims, in which courts should differentiate among claims based on the underlying transactions, government enforcement actions seek to prosecute or enjoin violations of law, not to obtain damages compensating for particular injuries." Br. for the United States at 5, *Motorola*, 775 F.3d 816 (7th Cir. 2014), 2014 WL 4447001, at *5. Judge Posner endorsed that position in holding that "there is a difference between actions brought by the DOJ and private class action damages." *Motorola*, 775 F.3d at 827. The R&R properly recognized and applied that distinction here.

Nor is the government's decision to charge conduct related to both the DoD and NATO contracts unprecedented. *Motorola* itself was a private antitrust damages suit arising from a conspiracy among Taiwanese and Korean electronics manufacturers to fix the price of LCD panels used in cellphones sold worldwide. Some of the same manufacturers had already been prosecuted and convicted by the United States in *United States v. Hsiung*, 778 F.3d 738 (9th Cir. 2015). *See Motorola*, 775 F.3d at 825 (noting the United States successfully prosecuted AU Optronics for criminal price-fixing of the LCD panels sold to Motorola's foreign subsidiaries). The indictment in *Hsiung* charged anticompetitive conduct with *both* foreign and domestic effects. *See* Superseding Indictment, *United States v. Lin et al.*, No. 3:09-cr-110-SI (N.D. Cal. June 10, 2010), ECF No. 8 at ¶ 17(f) ("The participants in the conspiracy issued price quotations in accordance with the price agreements and accepted payment for the supply of [LCD panels] sold at collusive, noncompetitive prices to customers in the United States and elsewhere."). As in this case, the government in *Hsiung* charged a conspiracy with both domestic and foreign

effects in a single-count indictment, and the jury convicted multiple defendants on that count. *See* Special Jury Verdict, *United States v. Lin et al.*, No. 3:09-cr-110-SI (N.D. Cal. March 13, 2012), ECF No. 851. The same can be said for several of the dozens of plea agreements the United States obtained in prosecuting one of the largest criminal antitrust investigations ever undertaken by the Department of Justice involving the "Vitamins, Inc." cartel. *See* Br. for the United States as Amicus Curiae Supporting Pet'rs at 2, *Empagran II*, 542 U.S. 155 (2004), 2004 WL 234125, at *2; *see also* Opp'n to Objections at 8 n.4.

Finally, to the extent Van Avermaet objects that principles of international comity caution against application of the Sherman Act to his conduct, those arguments are unavailing. R&R at 9; *see also* Reply ISO Objections at 4–5 (arguing that the R&R's interpretation of the FTAIA is "antithetical to the purpose of the FTAIA, which limited the reach of the Sherman Act to avoid a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs"); NATO MTD at 7 (arguing the exercise of jurisdiction "related to a NATO contract would create a serious risk of interference with the ability of Belgium, other NATO members, and NATO itself to regulate their own commercial affairs.") (internal quotations and citations omitted throughout). The Supreme Court has acknowledged that "America's antitrust laws, when applied to foreign conduct, can interfere with a foreign nation's ability independently to regulate its own commercial affairs." *Empagran II*, 542 U.S. at 165. But "it is well established—quite apart from the FTAIA—that the Sherman Act applies to foreign conduct that was meant to and did produce some substantial effect in the United States." Br. for the United States at 14, *Empagran II*, 542 U.S. 155 (2004), 2004 WL 234125, at *14. As explained above, the price-fixing conduct Van Avermaet allegedly engaged in was meant to and did affect domestic commerce through the rigged DoD contracts. "The Sherman Act and the

FTAIA have thus supplanted any general background presumption against extraterritoriality within those fields involving effects on domestic commerce." *Id.*[4]

      iii.      <u>Issues Outside the Scope of this Opinion</u>

Because the court concludes that the conspiracy considered as a whole had a direct, substantial, and reasonably foreseeable effect on domestic commerce, it need not consider the parties' arguments that the court can dismiss a portion of a single conspiracy count. R&R at 7; Objections at 7–9; *see also* Gov't's Consol. Opp'n to Mots. to Dismiss at 14–15. Van Avermaet's recent "Notice of New Evidence" in support of his NATO motion to dismiss does not move the needle. He argues that "NATO's independent legal status not only establishes that the contract at issue is wholly foreign commerce, but also makes clear the practical consequence that Mr. Van Avermaet will be unable to obtain discovery necessary to preparing his defense if this portion of Count One is not dismissed." Notice of New Evid. ISO NATO MTD at 1, ECF No. 65. Van Avermaet's Notice is devoid of case citation and, as explained above, does not affect the court's decision as to whether the overarching conspiracy satisfies the FTAIA's domestic effects exception. Van Avermaet has not moved to compel the information he apparently seeks from NATO. See Mot. to Compel Disc. at 6 n.1, 14 n.5, ECF No. 29 ("Mr. Van Avermaet is not moving to compel the search for or production of documents and information from NATO based on the government's representation that NATO is an independent international organization and that the government does not have possession of, custody of, or

---

[4] DOJ Guidelines also recognize that "[a] decision to take an investigative step or to prosecute an antitrust action under the federal antitrust laws represents a determination that the importance of antitrust enforcement outweighs any relevant foreign policy concerns." DOJ Guidelines at 28. As the DOJ Guidelines note, that determination is entitled to deference. *Id.* at 28 n.105 (citing *United States v. Baker Hughes, Inc.*, 731 F. Supp. 3, 6 n.5 (D.D.C.), *aff'd*, 908 F.2d 981 (D.C. Cir. 1990)).

control over NATO documents."). He is free to bring a motion that expands on his unsupported assertion that inclusion of conduct directed at NATO contracts "raises serious constitutional concerns about Mr. Van Avermaet's access to materials necessary to prepare his defense," but such a motion is not before the court at this time. *See* NATO MTD at 6.

C. **Objection 2: The R&R erroneously concludes that the Indictment states an offense against Van Avermaet.**

Van Avermaet objects to the R&R's determination that the DoD portion of the indictment stated an offense against him by alleging that all Defendants and their co-conspirators engaged in a conspiracy "by coordinating price increases; submitting artificially-determined, non-competitive, inflated bids; and refraining from bidding for certain contracts." R&R at 11 (quoting Indictment ¶ 17). He argues that the R&R based its analysis on a "conclusory allegation" that "did not include all the required elements of the offense." Objections at 11–12. He does not identify which required elements the Indictment omits, but repeats his arguments that the charged conspiracy did not involve Van Avermaet's company or employees, and did not begin until after Van Avermaet left G4S. Objections at 12.

The R&R did not ignore those arguments. *Id.*; *see* R&R at 11–13. It explained that "conspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring," *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940), and the court must assume the truth of the Indictment's allegations, *Weeks*, 636 F. Supp. 3d at 120. *See* R&R at 11–12. To state a valid Section 1 offense, the Indictment needed only allege that Van Avermaet joined a per-se-illegal conspiracy. *See, e.g.*, *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946). The Indictment did so in alleging that Defendants, including Van Avermaet, entered into a horizontal price-fixing conspiracy "[b]eginning at least as early as Spring 2019," Indictment ¶ 16, before Van Avermaet left his company. For the reasons ably

explained by Judge Faruqui, the R&R correctly held that the government has sufficiently alleged Van Avermaet's participation in a conspiracy to survive a motion to dismiss.

### III.   CONCLUSION

For the reasons stated above, the court will DENY Defendant's NATO and DoD motions to dismiss, ECF Nos. 42 and 43.  A corresponding Order will accompany this Memorandum Opinion.

Date: January 25, 2024

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge